481 A.2d 250

**Elizabeth Horton ELLSWORTH**

v.

**SHERNE LINGERIE, INC., et al.**

**No. 1603, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Sept. 10, 1984.

Certiorari Granted Dec. 26, 1984.

106

John A. King, Rockville, for appellant.

Matthew D. Osnos, Upper Marlboro, with whom were Kevin J. McCarthy and O'Malley, Miles, McCarthy, Harrell & Levin, Upper Marlboro, for appellee, Sherne Lingerie, Inc.

William M. Nickerson, Baltimore, with whom were White-ford, Taylor, Preston, Trimble & Johnston, Baltimore, on brief for appellee, Cone Mills Corp.

Argued before MOYLAN and LISS, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

LISS, Judge.

In February of 1981, Elizabeth Horton Ellsworth,[1] appellant, filed a declaration in the Circuit Court for Montgomery County, in which she sued Sherne Lingerie, Inc., appellee (hereafter Sherne). The declaration alleged damages sustained by the appellant by reason of the defendant's negligence and strict liability. Subsequently, an amended declaration was filed in which Sherne was charged with a breach of implied warranty. Another defendant, Cone Mills Corporation, also an appellee herein (hereafter Cone Mills), was added as a co-defendant and the allegations as to negligence and strict liability were added to appellant's complaint against Cone. No breach of implied warranty was charged against Cone. Compensatory and punitive damages were sought against both defendants.

In her amended declaration the appellant alleged that she was seriously burned while wearing a flannelette nightgown which was unreasonably dangerous because of the high flammability of the fabric from which the nightgown had been made and because of an absence of any warnings of the danger inherent in the use of the nightgown.

Jury trial began on September 19, 1983. A directed verdict on the punitive damages count was entered in behalf of both defendants at the close of appellant's case-in-chief. The jury returned a general verdict in favor of both defendants on the remaining issues in the case. It is from these

---

1. On the first day of trial, September 19, 1983, an oral order was entered amending the caption of the case to read "Elizabeth Horton" rather than "Elizabeth Horton Ellsworth."

judgments that appellant has filed this appeal, raising the following issues:

I. Whether the trial court's refusal to instruct the jury that contributory negligence is not a defense to strict liability, and the trial court's actual instruction on product misuse constituted reversible error?

II. Whether there was prejudicial, reversible error in the trial court's evidentiary rulings as to:

The Statistical Data,

The British Sleepwear Law,

The "Burning Dress" Film,

The "Newspaper" Test, and

The Chart Illustrating Sherne Lingerie's Market Position?

## STATEMENT OF FACTS

Appellant, Elizabeth Horton, was injured when her nightgown caught fire while she was in her kitchen making coffee. She was wearing the nightgown inside out so that two pockets at hip level were protruding.

Appellant placed a kettle over the small electric burner located on the front of the range. Most of the burner was covered by the kettle, with less than an inch of the burner exposed. As appellant reached over the range to a cabinet above it, in order to obtain a coffee filter, some part of her nightgown either touched or came close to the exposed portion of the burner. Although appellant was wearing the nightgown inside out, whether a protruding pocket was the actual ignition point was never resolved. One pocket was undamaged, the other partially burned. The burner height was approximately hip level where the pockets were protruding. Ms. Horton smelled something burning but did not discover that her gown was on fire until she felt the heat moving up her back. Damages were not seriously challenged by the defendants and are not an issue on appeal.

The nightgown was made from 87½% cotton and 12½% polyester fabric, manufactured and sold by Cone Mills Corporation; the nightgown was designed, manufactured and placed in the stream of commerce by Sherne Lingerie, Inc. It was an ordinary pullover type gown which has been a popular item of ladies' sleepwear for many years. In 1977, when this gown was manufactured, approximately thirteen million dozen items of cotton adult sleepwear were produced. This particular nightgown was the business mainstay of Sherne, and is still manufactured by Sherne today.

In early 1977, Cone Mills sold the fabric from which the nightgown was manufactured to Sherne, and at the direction of Cone's president, the shipping document included the following warning:

This fabric is not intended for use in children's sleepwear or robes in sizes 14 and under. Flammable. Does not meet standards for flammability in children's sleepwear, FF5–74 and U.S. Department of Commerce Standard DOC FF3–71. Should not be worn near source of fire.

The language was understood by Sherne to be a warning, but Sherne did not pass on this warning to consumers of its products. Sherne offered testimony that no manufacturer of ladies' nightwear places flammability warnings on cotton nightgowns.

Cone Mills marketed the fabric at issue for the adult sleepwear market. It was aware that ladies' nightwear has been the subject of particular investigation with respect to the adoption of new flammability standards by the federal government; that ladies' nightwear has been identified as a higher risk category than other apparel which has been investigated, and that ladies' adult sleepwear and kitchen ranges in combination has been identified as a significant hazard category by the federal government. A representative of Cone Mills testified that the nightgown worn by appellant should not have been worn while making coffee, because, among other reasons, of its loose and flowing design, although both defendants conceded that wearing

this nightgown in close proximity to an electric range was foreseeable.

Defense experts, however, contended that the fabric was perfectly safe for use in an adult nightgown.

It was established that the fabric, and hence the garment, complied with the Federal Flammable Fabrics Act, the only federal standard applicable to general apparel.

The Federal Flammable Fabrics Act is contained in Title 15, Commerce and Trade, of the United States Code Annotated, §§ 1191–1204. Additionally, Title 16—Commercial Practices—of the Code of Federal Regulations, incorporates the Federal Flammable Fabrics Act and a complete description of the test method which it mandates. The Act renders unlawful the manufacture, sale, importing or introducing of fabric which, under the standard of flammability described in the Act, is so highly flammable as to be dangerous when worn by individuals. The standard provides for three separate classes of flammability as determined by a test method which measures both ease of ignition and the speed of flame spread.

The test method for the standard adopts Commercial Standard 191–53, developed in 1953, and provides for a testing apparatus which basically delineates as "normal" a flannelette textile which, after ignition, requires more than seven seconds for the flame to spread a measured distance in a controlled attitude and atmosphere. When the time of the flame spread is measured between four and seven seconds in the test apparatus, the textile passes the standard but is classified as "intermediate flammability." Textiles which test the flame spread in the apparatus at less than four seconds are termed "rapid and intense burning" and do not pass the standard. This standard measures the rate of burn of a 5-inch specimen of oven dried fabric mounted at a forty-five degree (45°) angle. After ignition, the time that it takes for the flame to burn a cotton stop cord, which is placed at the top of the fabric, is measured. Raised fabric, such as cotton flannelette, fails if the time is

less than four seconds.  The burning time of the fabric at issue, according to that test method, is 9.8 seconds.  *See Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727 (Minn., 1980) for a case involving identical burning time.

The significance and validity of the federal standard as a measure of flammability hazard or safety was the subject of considerable disagreement among the experts at trial. The flammability characteristics of the fabric at issue were also strenuously disputed by the expert witnesses.  Additionally, the experts disputed the feasibility of warning labels and methods of chemical flame retardancy.

Evidence which was excluded by the trial court included: oral evidence and federal publications offered to show the nature and magnitude of the risks posed by fabric and garments which comply with the federal flammability standard;  oral and written evidence to show the magnitude of the hazard associated with ladies' sleepwear;  a film which was offered to show the flammability and extinguishment characteristics of the fabric;  evidence that ordinary newsprint passes the federal standard by a wide margin;  and evidence that under longstanding British flammability standards the garment would be banned from commerce unless it were flame retarded or carried a flammability warning label.

## I.

Appellant complains initially that the trial judge, over appellant's objection, erroneously instructed the jury that misuse of the product was a valid defense to the strict liability count of the declaration, and that such error was compounded by the refusal of the trial court to instruct the jury that contributory negligence was not a defense to that count.  Appellant argues that these errors set the stage for defense counsel to argue, improperly, in their closing arguments, erroneous statements of the applicable law which equated accidental or careless conduct by the appellant with product misuse.  That issue, however, has not been pre-

served for appeal. No objection was made to the argument by counsel. Maryland Rule 1085.

Appellant did make appropriate objection to the trial court's instruction that product misuse is a defense to strict liability and also to the trial court's refusal to instruct the jury that contributory negligence is not a defense to strict liability.

■ The doctrine of strict liability in tort was adopted by the Court of Appeals in 1976. *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976). It is differentiated from an ordinary negligence action in two material respects. First, the burden of proof for a plaintiff injured by a defective product is eased by eliminating the need to establish negligence on the part of the manufacturer. *Id.*, at 278 Md. 343, 363 A.2d 955. Second, the contributory negligence of the plaintiff will not bar recovery. *Sheehan v. Anthony Pools, A Division of Anthony Industries, Inc.*, 50 Md.App. 614, 440 A.2d 1085, *aff'd*, 295 Md. 285, 455 A.2d 434 (1983). In this case, appellant's principal contention at trial was that the appellees were strictly liable for the manufacture and distribution of the nightgown manufactured and distributed in a defective and unreasonably dangerous condition. Appellees denied that either the fabric or the nightgown was unreasonably dangerous and further contended that the appellant had misused the product by wearing the nightgown inside out so that the two hip pockets of the nightgown protruded in close proximity to a lit electric burner on a kitchen range, and that this conduct of the appellant was the proximate cause of the fire. We agree with the trial judge that there was sufficient evidence before him to require him to submit the issues of strict liability and misuse of product to the jury for its determination.

Since the trial court denied appellees' motions for directed verdict it was left to the jury to decide whether the appellees were strictly liable for the sale of a defective and unreasonably dangerous product and if they were, whether

any defense was available to appellees to defeat appellant's recovery of damages.

Appellant's complaint is directed primarily at the court's instruction on the misuse of product defense and on its refusal to instruct the jury that the "inattention, lack of alertness or contributory negligence of the plaintiff is not a defense to strict liability."

The trial court's instructions on strict liability and product misuse were given as follows:

> With respect to strict liability, in order for you to find in favor of the plaintiffs, you must find by a preponderance of the evidence that the defendants manufactured a defective product which was unreasonably dangerous to the consumer and that the defect was the approximate [sic] cause of plaintiff's injuries. And that the defendant has not shown by a preponderance of the evidence that the plaintiff misused the product. So in the strict liability theory, it is for the plaintiff to show by a preponderance of the evidence that the defendant manufactured a defective product, which was unreasonably dangerous and that the defect was an approximate [sic] cause of the plaintiff's injuries.
>
> On the other hand, it would be for the defendant, if they established—if the plaintiff established what I just mentioned, it would be the burden of the defendant to show that the defendant [sic] misused the product.
>
>   *   *   *   *   *   *
>
> On a strict liability theory, you must find by a preponderance of the evidence that the defendant manufactured a defective product, which was unreasonably dangerous to the consumer and that the defect approximately [sic] caused the plaintiff's injuries. That is the burden of the plaintiff.
>
> The burden is then upon the defendant to show that the plaintiff misused that product. So if the plaintiff meets her burden of sharing [sic] the strict liability theory, you

then look as to whether the defendant might have shown a misuse of the product.

Appellant objected to the misuse instruction, stating that there was no factual basis in the record to justify the giving of such an instruction and specifically requested the court to give an additional instruction that the "inattention, lack of alertness or contributory negligence of the plaintiff is not a defense to strict liability." Appellant argues that the trial court's refusal to give the requested instruction left the jury without essential guidance in determining whether the appellant could recover in strict liability even if she had been contributorily negligent or whether she was barred because she had "misused" the product.

The gist of appellant's argument appears to be that, through this combination of circumstances, defense counsel were permitted to argue improperly that it is possible to misuse a product accidentally as well as purposefully, and that the jury was therefore misled in that it was not made clear that some "deliberate, knowing and unreasonable conduct on the part of appellant is required to defeat her claim...."

We note, however, that appellant made no specific objection to any argument by appellee's counsel at any time. Appellant's counsel had the last word in rebuttal argument and had the opportunity to point out to the jury any misconception appellant felt may have been caused by defense counsel's argument to the jury.

■ While this would not cure erroneous instructions by the trial court, our reading of the record extract convinces us that the evidence before the court focused primarily on the threshold issue, *i.e.*, whether the product here involved was unreasonably dangerous and its manufacture and sale subjected the appellees to strict liability for its sale and distribution. The affirmative defenses of misuse of product and whether plaintiff's conduct was misuse of the product so as to amount to the proximate cause of plaintiff's injuries was, however, also generated by the evidence. We do

not conclude that the court's instructions as given in the light of the evidence before it were erroneous.

The general verdict returned by the jury offers us no enlightenment as to the basis of its finding of a verdict for the defendants. If appellant entertained any serious thought that the jury would find one or both of the appellees to be legally liable for her injuries, yet deny her a verdict by applying an affirmative defense as a bar, the recording and preservation of such a result was readily at hand through a request to the court for the return of a special verdict on written questions under Maryland Rule 560.

Further, the instructions to the jury adequately delineated and discussed the applicability of these defenses. Appellant's reliance on the concerns expressed by this Court in *Sheehan v. Anthony Pools, A Division of Anthony Industries, Inc., supra,* are misplaced. The instructions given by the trial court in the case *sub judice,* pertaining to these affirmative defenses did differentiate between contributory negligence as a defense to the negligence claim and misuse as a defense to strict liability. Appellant's counsel seemed to have been satisfied at the time that this was so, when he reiterated and clarified the jury instructions in closing argument, stating:

> I ask you to recall what [the trial judge] instructed you on the law. Contributory negligence defense only applies to the negligence count. Inattention or carelessness is not a defense in strict liability, it does not and that is the law.

This was the last word to the jury on the subject.

■ On appeal appellant seeks to single out and complain of error in the trial court's instructions to the jury relating to affirmative defenses which implies an emphasis on issues which amounted to minor roles in both the presentation of evidence and argument to the jury at the trial below. Appellant's argument that she was entitled to an affirmative instruction from the trial court that contributory negligence was not a defense to strict liability is without merit.

It has long been recognized in this State that there is no such right or entitlement. As the Court of Appeals stated in *Board of Commissioners of Howard County v. Pindell,* 119 Md. 69, 81, 85 A. 1041 (1912), "[i]t is well settled, that where the granted prayers contained the law of the case, the judgment will not be reversed, if other prayers, although correct, are rejected, and this is so, because the law of the case has been sufficiently covered by the granted prayers." [Citations omitted]. In this regard, Maryland Rule 554 b 1 specifically states, in pertinent part, that the trial court, "need not grant any requested instruction if the matter is fairly covered by instructions actually given . . . ."

In reviewing the refusal of a trial judge to give a "negative" instruction (negating a defense or theory) such as that requested by appellant in the instant case, we have said, in *Lumber Terminals, Inc. v. Nowakowski,* 36 Md.App. 82, 373 A.2d 282 (1977),

> Appellant's contentions relative to inadequate instructions are equally without merit . . . The judge need not negate every inapplicable theory, and should not when there is no supportive evidence to justify negative instructions (e.g., inapplicability of "rules of the road"); and he need not expound precisely that language requested if the appropriate and applicable law is fairly covered in his charge. Maryland Rule 554.b.1. [*Id.,* at 87–87, 373 A.2d 282].

▮ Appellant argues that the holding of the Court of Appeals in *Sheehan v. Anthony Pools, A Division of Anthony Industries, Inc., supra,* that the giving of a negative instruction on contributory negligence requested by the plaintiff entitles the defendant to an instruction on the assumption of risk defense, requires that the plaintiff be granted a negative instruction on contributory negligence where the defendant has been granted an instruction as to the assumption of risk defense. This is not the law, since proper jury instructions are predicated on the facts and law involved in a particular case. We are not convinced that the Court of Appeals intended the implication of such a

negative inference in *Sheehan v. Anthony Pools, A Division of Anthony Industries, Inc.* However, even if we accept this premise, *arguendo*, it is clear that the trial court committed no error in refusing to give appellant's requested instruction negating the contributory negligence defense as to the strict liability cause of action, since the trial court gave no instruction on the assumption of risk defense.

## II.

■ Appellant next contends that the trial court committed reversible error in several of its rulings concerning the admissibility of evidence offered by the appellant and appellees. In considering these contentions we must do so in the light of the long-standing principle that the admission or exclusion of evidence is a function of the trial court which, on appeal, is traditionally viewed with great latitude.

Appellant was permitted to introduce expert testimony by Dr. Stephen Spivak, a professor in the Department of Textiles and Consumer Economics at the University of Maryland, who qualified as an expert in the flammability of fabrics and apparel. His evidence, as admitted, concerned the burning characteristics of the particular fabric used in this garment and the design aspect of the specific garment here involved. Dr. Spivak also testified that the fabric and design were within the federal flammability standards adopted thirty years earlier. Appellant then sought to put the federal standard on trial. It was appellant's contention that the fabric and the garment were unreasonably defective and dangerous and she sought to introduce evidence which demonstrated the magnitude of the public danger and the invalidity of the federal flammability standard as a public safeguard. Dr. Spivak, upon objection, was not permitted to testify about the number of injuries associated with flammable fabrics in the United States each year, the number of injuries and deaths associated with flammable apparel, the cost to the economy of burns and injuries associated with flammable fabrics or whether there have been injuries and the number of deaths involving apparel

made of fabrics which pass the federal standards. He was also precluded from identifying the specific fabrics which pass the federal standards but have been involved in burn injuries, or the number and severity of burn injuries associated with ladies' adult nightgowns made of fabrics permitted under the federal flammable statute.

The trial judge rejected statistical data assembled by the Flammable Fabrics Accident Case Testing System on the basis that it was hearsay evidence and that it was not relevant to the case.

Appellant argues the admissibility of the offered testimony on the ground that the expert witness in answer to the specific questions asked would have based his opinions on information obtained from public records admissible into evidence under the common law exception to the hearsay rule, citing as authority 3 Am.Jur.2d *Evidence,* §§ 991, 995. Appellant, however, fails to take into account the following language found in § 991:

> Not all documents which have been prepared by a public official and filed in a public office are evidence of the truth of the matters they contain. It is generally held that the facts stated in the documents must have been within the personal knowledge and observation of the recording official or his subordinate, and that reports based upon general investigations and upon information gleaned second-hand from random sources must be excluded. Moreover, it has been held that records which concern causes and effects, involving the exercise of judgment and discretion, expressions of opinions, or the drawing of conclusions, are not admissible as public records.

Upon application of the standards here enunciated, it is clear that the statistical data sought to be admitted into evidence were hearsay. Appellant then suggests that Maryland Code (1974, 1984 Repl.Vol.) Courts and Judicial Proceedings Article, § 10–204 appears to permit admission of reports or records containing information not based on

the personal knowledge of the person making the report or records but fails to note that such records may be received in evidence "if otherwise admissible." [*Id.*]

■ Appellant sought to base her attack on the alleged dangerous and defective material and design primarily by contending that even though the fabric met the federal standards, these standards were inadequate to protect the public and specifically the appellant. If we accepted such an approach to the trial of this case the issue might well have degenerated into a question of whether the federal standards in effect for thirty years were adequate and the jury would have been called upon to express its opinion on an issue clearly irrelevant in the case before them. We find no error in the trial court's ruling on the admissibility of the statistical evidence sought to be offered by the appellant.

■ Appellant asseverates that the trial court erred in excluding from evidence the United Kingdom (British) statute which included test methods differing substantially from the United States test, and required treatment of fabrics with flame retardation materials or a flammability warning on sleepwear sold in the United Kingdom. The record indicates that appellant was permitted to offer evidence as to the existence and nature of the British test method but was denied only an opportunity to offer evidence as to the British statute. The jury was permitted to have before it and to take into account the existence of alternative testing methods. Whether the appellees' material or design would have been found defective under the British standard was entirely irrelevant to the case before the jury. The fact, if true, that the law of the United Kingdom might have found the fabric or design of the product here in question defective or dangerous under its statutes had no bearing on the issue submitted to the jury. The trial judge made it clear to the jury that insofar as the United States federal standards were concerned, compliance with these standards was "not necessarily conclusive evidence of due care." The case was submitted to the jury on

the issue of whether the appellees had caused a dangerous and/or defective material to be used in an adult nightgown or had defectively designed the nightgown so as to make its use dangerous to its purchaser. We find no error in the trial judge's ruling on the admissibility of the evidence.

Appellant next contends that the trial court committed reversible error when it excluded a film offered by the appellant showing the ignition and burning of an A-line skirt mounted on a mannequin made from a fabric with identical flammability characteristics as the fabric here at issue. The film was made by the University of Maryland for the National Bureau of Standards, intended to illustrate Dr. Spivak's testimony concerning ease of ignition, intensity of burning, and difficulty of extinguishing the fabric fire after ignition.

The trial court rejected the film on the grounds that the admission of the film might mislead or confuse the jury and excite its sympathy or prejudice. In view of the fact that the evidence which the film was intended to illustrate had already been testified to by the several experts and the film was cumulative, the ruling by the trial court was clearly within its discretion. The Court of Appeals has said, in *State, for Use of Chima v. United Railways & Electric Company*, 162 Md. 404, 418, 159 A. 916 (1932):

> When moving pictures might and might not be used advantageously and properly in placing the facts before juries is a question the answer to which must vary with one case and another, and we think the decision in each case must be left largely to the judgment and discretion of the presiding judge, without any restricting general formula laid down to control him. In this case there were other available means of proving [that which was sought to be proved by the motion pictures], and we do not see any grounds for holding that the court acted erroneously in excluding the resort to moving pictures.

This Court said, in *Lahocki v. Contee Sand and Gravel Co., Inc.*, 41 Md.App. 579, 600, 398 A.2d 490, *rev'd on other*

*grounds, General Motors Corp. v. Lahocki,* 286 Md. 714, 410 A.2d 1039 (1980),

The discretion exercised by a trial judge in admitting or rejecting motion pictures is considered one best left to the judgment of a presiding judge. No precise limitations beyond his own good judgment have been laid down. [Citation omitted].

Appellant penultimately contends that the trial court's exclusion of evidence that "ordinary" newsprint would pass the CS 191–53 federal test amounted to reversible error. Appellant argues that the evidence was relevant because it would have permitted the jury to compare the rate of burn of the fabric in question with the rate of burn of newspaper, the burning characteristics of which are known to most lay persons. Appellant further contends that the appellees' trial strategy and their closing arguments concentrated in large measure on the fact that the fabric complied with the federal standards. They argued that the existence of a federal standard means that the standards must be effective and that compliance with the standards means that the fabric must be safe. Because the appeal of this argument is so simple and obvious, it was an abuse of discretion for the trial court to limit appellant's opportunity to challenge the standard by excluding proof that the standard is so weak that ordinary newspaper will pass the standard by a wide margin.

Appellees offer three reasons why this evidence was not relevant. First, newspaper or newsprint is not a fabric of the same type as the fabric in question, any more than cardboard or bathroom tissue is. Newspaper or newsprint is not utilized for the same purposes that the fabric in the instant case was.

Second, appellant's assertion that the burning characteristics of newspaper or newsprint are known to most lay persons is unsupported by evidence offered. While the burning characteristics of newspaper or newsprint are with-

in the knowledge of some lay persons, there are certainly many other people who would not have this knowledge.

Third, appellant refers to "newsprint" or "newspaper" as if all newsprint or newspaper is the same, and possesses the same burning characteristics. In point of fact, there are different types of newspaper and newsprint, with different chemical compositions and different burning characteristics.

■ We conclude that the proffered evidence as to the flammability of newsprint was clearly irrelevant and that its admission would have been confusing, misleading and of no probative value to the jury. We find no error in the judge's ruling.

■ Finally, appellant complains about the introduction of a graph which purported to illustrate the appellees' sales share of the American adult sleepware industry. The fact that appellees represented .0006 of sales of the total industry had been testified to without objection. The graph was offered as being relevant to the issue whether it was feasible for the appellees to use warning labels or flame retardants on their garments when there was evidence that such measures were not generally undertaken in the American sleepware industry. We hold that the admission of the chart was within the discretion permitted to the trial court.

JUDGMENT AFFIRMED, COSTS TO BE PAID BY APPELLANT.